**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | |
| v. | : | Criminal No. 23-cr-73 (CKK) |
| | : | |
| MELVIN EDWARD ALLEN, JR. (17), | : | |
| | : | |
| Defendant. | : | |

## GOVERNMENT'S SENTENCING MEMORANDUM

Defendant Melvin Edward Allen, Jr. pled guilty to one count of Conspiracy to Distribute and Possess with Intent to Distribute 40 Grams or More of Fentanyl. For the reasons herein, the Government respectfully requests that the Court sentence the Defendant to the 78 months of imprisonment also recommended by the United States Probation Office, followed by four years of supervised release.

## BACKGROUND

Beginning no later than August 2020 and continuing until his arrest in November 2023, the Defendant conspired to, and did in fact, distribute and possess with intent to distribute a mixture and substance containing a detectable amount of fentanyl, a Schedule II narcotic drug-controlled substance. The amount of said mixture and substance, including the reasonably foreseeable conduct of all the members of the conspiracy known to the Defendant, was 1.2-4 kilograms.

Specifically, the Defendant participated in a fentanyl trafficking conspiracy whose purpose was to distribute fentanyl-laced counterfeit oxycodone pills from Southern California to destinations throughout the United States, including to the District of Columbia. He entered into this conspiracy after he was introduced to a Los Angeles-based drug trafficker, Hector David Valdez, who was a distributor of fentanyl-laced counterfeit oxycodone pills. The Defendant was introduced to the Los-

Angeles-based trafficker by D.C.-based co-conspirators of his, including co-defendant Darius Quincy Hodges.

The Defendant's role in this conspiracy was to travel to Southern California in order to facilitate the sale of fentanyl-laced counterfeit oxycodone pills from Valdez to D.C.-based fentanyl redistributors who worked with the Defendant. The Defendant most frequently brokered the purchase of fentanyl-laced counterfeit oxycodone pills from Valdez in person, taking approximately 65 flights to Los Angeles International Airport (LAX) from the Washington, D.C. Metropolitan Area over the life of the conspiracy. For example, on November 2, 2022, the Defendant flew to LAX from D.C. Later that day, Valdez texted the Defendant: "when you coming," to which the Defendant replied, "I be there tonight."

That same day, the Defendant offered Valdez the opportunity to fulfill a separate bulk fentanyl purchase brokered by the Defendant. The Defendant informed Valdez that "the other folks coming tomorrow," to which Valdez replied: "I got the ones your peeps wanted. And ite." The Defendant replied: "I need them for 50. So I can tell them 60." In so doing, the Defendant indicated his desire to obtain fentanyl-laced counterfeit oxycodone pills from Valdez for a price of 50 cents per pill, so that he could turn a 10 cents per pill profit on the transaction. Valdez replied, "I don't even get them for 50 g tbh," and the Defendant then countered, "55." Valdez then asked the Defendant which associate of the Defendant was the intended recipient for the pills, and the Defendant confirmed that it was an unindicted co-conspirator who is a D.C.-based fentanyl trafficker. Two days later, the Defendant stated that Valdez "failed the test my boy," because Valdez failed to meet the Defendant's per-pill price demands.

The Defendant, in turn, used his commissions from the sales he brokered to fund a lavish lifestyle, including significant expenditures on luxury clothing and jewelry, including the below-depicted examples.

 

The amounts of money the Defendant spent are informative to the Court with respect to the quantities of fentanyl-laced counterfeit oxycodone pills for which the Defendant brokered sales. As illustrated by the above-excerpted conversation, the Defendant was negotiating a contemplated sale where his profit, on a per-pill basis, would be in the vicinity of 5-10 cents per pill. These relatively low profit margins indicate the massive quantities of pills in which the Defendant dealt in order to fund such an extravagant lifestyle.

3

Indeed, by the Defendant's own admission during his plea colloquy received by the Court on December 18, 2024, in total, and prior to his arrest, the conspiracy in which the Defendant participated resulted in the transportation of hundreds of thousands of fentanyl-laced counterfeit oxycodone pills into the District of Columbia for redistribution.

## **STATUTORY PENALTIES**

Pursuant to Title 21, United States Code, Sections 841(a)(1), 841(b)(1)(B)(vi), and 846, the offense of conviction carries a mandatory minimum term of five years of imprisonment and a maximum term of 40 years imprisonment, a fine not to exceed $5,000,000, and a term of supervised release of at least four years.

## **SENTENCING GUIDELINES**

The Government concurs with the Pre-Sentence Report [ECF No. 605] ("PSR") calculation that the Defendant is a zero-point offender, as that term is defined in Section 4C1.1 of the United States Sentencing Guidelines (the "Guidelines"). PSR at ¶ 108. The Government also concurs with the PSR that the Defendant's base offense level is 32, before any downward adjustments, and that the Defendant accepted responsibility early enough in the case so as to qualify for a three-point reduction to his offense level. PSR at ¶¶ 105-07. Thus, based upon the final PSR released on April 4, 2025, the resultant total offense level of 27, along with a Criminal History Category of I, results in a corresponding range of imprisonment under the Guidelines of 70 months to 87 months, with a mandatory minimum of 60 months of imprisonment to be imposed. Consistent with the terms of the parties' plea agreement, the Government has agreed to cap its allocution at the midpoint of the Defendant's applicable Guidelines range, which is 78 months. ECF No. 525, § 5.

## LEGAL PRINCIPLES

When determining the appropriate sentence, the district court should consider all of the applicable factors set forth in Title 18, United States Code, Section 3553(a). *See United States v. Gall*, 552 U.S. 38, 49-50 (2007). Indeed, the Guidelines themselves are designed to calculate sentences in a way that implements the considerations relevant to sentencing as articulated in Section 3553(a). *United States v. Rita*, 551 U.S. 338, 348-50 (2007). The Section 3553(a) factors include: (1) the nature and circumstances of the offense and the history and characteristics of the defendant; (2) the need for the sentence imposed to reflect the seriousness of the offense, to provide just punishment for the offense, to afford adequate deterrence to criminal conduct, to protect the public from further crimes of the defendant, and to provide the defendant with needed correctional treatment; (3) the kinds of sentences available; (4) the sentencing range established by the Sentencing Guidelines; (5) any related Sentencing Commission policy statements; (6) the need to avoid unwarranted sentence disparities; and (7) the need for restitution to any victims.

In *United States v. Booker*, 543 U.S. 220 (2005), the Supreme Court held that the mandatory application of the United States Sentencing Guidelines violates the Sixth Amendment principles articulated in *Blakely v. Washington*, 542 U.S. 296 (2004). As a consequence, the Court invalidated the statutory provision that made the Guidelines mandatory. *Booker*, 543 U.S. at 245. Nonetheless, a district court should begin all sentencing proceedings by correctly calculating the applicable Guidelines range. *See Gall*, 128 S. Ct. at 598 ("As a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark"). The Guidelines are the product of careful study based on extensive empirical evidence derived from the review of thousands of individual sentencing decisions. *See Rita*, 551 U.S. at 338; *see also* United States Sentencing Comm'n, Supplementary Report on the Initial Guidelines and Policy Statements 16-17

(1987); 28 U.S.C. § 994(m) (requiring Commission to "ascertain the average sentences imposed . . . prior to the creation of the Commission"); Comprehensive Crime Control Act of 1984, S. Rep. No. 98-225, at 438 (Commission should produce a "complete set of guidelines that covers in one manner or another all important variations that commonly may be expected in criminal cases"). In addition, the Sentencing Commission has continued to study district court and appellate sentencing decisions and to "modify its Guidelines in light of what it learns." *Booker*, 543 U.S. at 264 (the Sentencing Commission will continue "collecting information about actual district court sentencing decisions . . . and revising the Guidelines accordingly").

The Guidelines themselves are designed to calculate sentences in a way that implements the considerations relevant to sentencing as articulated in Section 3553(a). Any Guidelines calculation is based on the individual characteristics of the offense and the offender, as required by Section 3553(a)(1). The Guidelines themselves thus seek to implement—in a fair and uniform way—the offense specific characteristics that, themselves, comprise the "individualized assessment" the Supreme Court commends in *Gall*. *See Gall*, 552 U.S. at 50.

## ARGUMENT

A sentence of 78 months of imprisonment is appropriate in light of the seriousness of the offense. The Government's recommended sentence is also designed to deter others, promote respect for the law, and offer rehabilitation to the Defendant.

### 1.    The Nature, Circumstances, and Seriousness of the Offense

The count to which the Defendant pleaded guilty is serious. He joined a fentanyl trafficking conspiracy that spanned the country and that was responsible for the distribution of kilograms of fentanyl to the D.C. area and elsewhere. The Defendant's participation in this fentanyl conspiracy occurred against the backdrop of a widespread, lethal drug epidemic. According to the DEA,

"Fentanyl is a Schedule II controlled substance that is similar to morphine but about 100 times more potent. . . . Because of its potency and low cost, drug dealers have been mixing fentanyl with other drugs including heroin, methamphetamine, and cocaine, increasing the likelihood of a fatal interaction. . . . Two milligrams of fentanyl can be lethal depending on a person's body size, tolerance and past usage." *See* DEA, *Facts about Fentanyl*.[1] The lethality of fentanyl is reflected in nationwide statistics: roughly 79,526 people in this country died of drug overdoses in the 12-month period ending in December 2024. *See* CDC National Center for Health Statistics, *Provisional Drug Overdose Death Counts* (based on provisional data available as of May 4, 2025).[2] Of these deaths, roughly 47,861 (or about 60 percent) involved synthetic opioids (of which fentanyl is one). *Id.* (By comparison, in 2021, 48,830 people in the United States died of firearms. *See* JHU Bloomberg School of Public Health, *New Report Highlights U.S. 2021 Gun-Related Deaths: For Second Straight Year, U.S. Firearm Fatalities Reached Record Highs* (June 6, 2023)).[3] And, thanks in part to people like the defendants in this case, our community has been pummeled by fentanyl: in 2022, Washington, D.C., had an opioid overdose death rate of 48.9 people per 100,000—third among all 50 states and the District. *See* KFF, *Opioid Overdose Death Rates and All Drug Overdose Death Rates per 100,000 Population (Age-Adjusted)* (2022 timeframe).[4]

Here, though, the Defendant was doing more than facilitating large-scale fentanyl transactions. He was coordinating the sales of bulk quantities of fentanyl-laced pills that were disguised to look like legitimate oxycodone, which can fatally mislead users. The seriousness of the

---

[1] https://www.dea.gov/resources/facts-about-fentanyl.

[2] https://www.cdc.gov/nchs/nvss/vsrr/drug-overdose-data.htm.

[3] https://publichealth.jhu.edu/2023/new-report-highlights-us-2021-gun-related-deaths-for-second-straight-year-us-firearm-fatalities-reached-record-highs.

[4] https://www.kff.org/other/state-indicator/opioid-overdose-death-rates/

Defendant's conduct merits the Government's requested sentence.

2.      **The Defendant's History and Characteristics**

The Defendant, to his credit, has only minor prior infractions with the criminal justice system, and to this end, the Government concurs with the United States Probation Officer that the Defendant is correctly deemed a zero-point offender. *See* PSR, ¶ 108. Moreover, since his arrest, he has availed himself of numerous programs at his detention facility, as well as several professional certifications. *See id.*, ¶¶ 141-42. While these facts raise questions as to why the Defendant decided to join a drug conspiracy, they also suggest that he has an ability to make a living through lawful means.

The Defendant's history and characteristics, if taken at face value, also belie the necessity for the Defendant to participate in a fentanyl trafficking conspiracy. As noted in the PSR, prior to his arrest, the Defendant had incorporated five businesses.[5] *See id.*, ¶¶ 145-46. Nevertheless, a review of the Defendant's financial records indicate that he conducted approximately $1.2 million in Cash App and Apple Pay peer-to-peer transactions alone over the course of his participation in the conspiracy. And this only reflects the quantity of digital financial activity the Defendant conducted; he routinely boasted of his spending habits and wealth on social media, as excerpted below:

---

[5] The Government notes that a majority of the Defendant's businesses are incorporated under the "So Fast" moniker. There are two notable exceptions to this, however: (i) the Defendant incorporated a business whose acronym is "P.L.U.G." in 2015, which is at best apt, and at worst knowing, given that the term "plug" is a common term in the drug trafficking world to refer to someone's source of supply; and (ii) a business of the Defendant's that was not noted in the PSR, but was in fact authorized to be searched by a federal magistrate judge in connection with the Defendant's arrest in this case, is District 93, an illicit marijuana dispensary located in the 1000 block of U Street NW.



In sum, the Defendant's history and characteristics suggest that the Defendant is an intelligent and capable individual whose participation in this fentanyl trafficking conspiracy reflects a choice to pursue an easier (and incredibly lucrative) way of making a living. The Government's requested sentence balances this component of the 3553(a) factors in its resultant recommendation of 78 months imprisonment.

### 3.     Other factors

Given the catastrophic impact of drugs on our community, a sentence of 78 months imprisonment is warranted. Too many people do not understand or fear the consequences to themselves or their community that flow from this behavior, and they must understand that peddling counterfeit pharmaceuticals to profit off their fellow community members' addiction is

unacceptable. Further, the Government's requested sentence will hopefully provide the Defendant the skills and incentives he needs to make better choices and avoid criminal behavior in the future.

## <u>CONCLUSION</u>

The Defendant participated in a fentanyl trafficking conspiracy that extends throughout the continent. The Defendant accepted responsibility for his participation therein and acknowledged that this conspiracy resulted in hundreds of thousands of lethal, counterfeit pills being transported into the District of Columbia.  The Defendant's conduct is serious and merits a commensurate sentence. The Government respectfully recommends that the Court sentence the Defendant to 78 months of imprisonment, followed by four years of supervised release.

Respectfully submitted,

JEANINE FERRIS PIRRO
UNITED STATES ATTORNEY

By: _/s/ Matthew W. Kinskey_____
MATTHEW W. KINSKEY
SOLOMON S. EPPEL
Assistant United States Attorneys
D.C. Bar No. 1031975 (Kinskey)
D.C. Bar No. 1046323 (Eppel)
United States Attorney's Office
Violent Crime & Narcotics Trafficking Section
601 D Street, NW
Washington, D.C. 20530